# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL PATRICK-MURPHY HAMILTON,

        Defendant-Appellant.

UNPUBLISHED
February 9, 2016

No. 319980
Jackson Circuit Court
LC No. 12-004848-FC

Before: SAWYER, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree premeditated murder, MCL 750.316; assault with intent to commit murder, MCL 750.83; two counts of possession of a firearm during the commission of a felony, MCL 750.227b; and two counts of unlawfully driving away an automobile, MCL 750.413. Defendant appeals as of right. We affirm.

On September 8, 2012, Richard Marcyan and his brother, Robert Marcyan, went to 1789 Wamplers Lake Road to look at the cottage's deck. Defendant's father, Mark Hamilton, had asked Richard about making some repairs to it. At the cottage, Richard and Robert spoke with defendant. While Richard was subsequently speaking with Mark on the telephone, defendant went inside the cottage and came back to the deck. He had a shirt over his hand. Richard then heard a "bang" and a "boom," and when he looked over at Robert, Robert was lying on the deck, bleeding. As Richard called 911, he heard more gunshots. Richard ran through the neighboring yards. When the gunfire stopped, Richard was standing near the trunk of Robert's car, a BMW. Defendant was near the car's hood. Defendant pointed a gun at Richard, smiled, and pulled the trigger. No bullets fired. After Richard ran to a neighboring house, defendant drove off in Robert's car. Defendant crashed the car, and then he drove off in a pick-up truck. At trial, defendant did not dispute that he committed the charged crimes. Rather, he claimed that he was legally insane on September 8, 2012, because he was involuntarily intoxicated from Adderall, which he had been prescribed.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied effective assistance of counsel because defense counsel failed to discover and present evidence that would have contradicted the prosecution's theory, developed during trial, that defendant was engaged in larcenous conduct on September 8,

-1-

2012. The determination whether a defendant was denied effective assistance of counsel is a mixed question of fact and constitutional law. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). A trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's right to effective assistance of counsel. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review a trial court's findings of fact for clear error, but we review de novo questions of constitutional law. *Id.*

The Sixth Amendment right to counsel includes the right to the effective assistance of counsel. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). A defendant must satisfy two requirements in order to obtain a new trial because of the ineffective assistance of counsel. *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). First, the defendant must show that counsel's performance fell below objective standards of reasonableness. *Id.* In doing so, the defendant must overcome the strong presumption that counsel's action constituted sound trial strategy. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). We will not assess counsel's competence with the benefit of hindsight. *People v Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999). Second, the defendant must show that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Armstrong*, 490 Mich at 290.

During its opening statement, the prosecution told the jury that it could not provide a motive for the shooting of Robert. However, during closing argument, the prosecution argued that money was a motive for the shooting. Specifically, the prosecution argued that defendant was a drug addict who was out of money and that, on September 8, 2012, in order to obtain money for his drug habit, defendant attempted to break into a neighboring house, broke into his parents' cottage and bagged up items, and shot Robert. Defendant had told Dr. Jeffery Wendt that Robert looked like he had money. According to defendant, defense counsel was ineffective for failing to discover and present evidence that a screen on the neighboring house was torn before the day of the shooting, that the window screen was missing from the cottage because it had been sent for repairs, that defendant had a key to the cottage, and that the items in bags in the cottage belonged to defendant. Defendant claims that defense counsel should have called his mother, Bernadette Hamilton, to testify to these facts.

Decisions regarding whether to call witnesses are presumed to be matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Assuming without deciding that defense counsel should have been aware that the prosecution changed its theory regarding motive during trial and that defense counsel knew or should have known of the facts that defendant claims would have been testified to by Bernadette, defense counsel's performance in failing to call Bernadette as a witness to prevent the prosecution from arguing that defendant had engaged in larcenous conduct on September 8, 2012, did not fall below objective standards of reasonableness. *Armstrong*, 490 Mich at 289.

At the evidentiary hearing, defense counsel testified that he had a strategic reason for not calling Bernadette as a witness. He did not believe that Bernadette would make a credible witness, and Bernadette would be subject to vigorous cross-examination, in which the prosecution could elicit testimony that would undermine the insanity defense. Jared Hopkins, who played the prosecutor in mock cross-examinations of Bernadette, testified that Bernadette could not have helped the defense that defense counsel planned; she would only hurt it. In

addition, he explained that the prosecution would have used Bernadette's affection for defendant against Bernadette and would have gotten into defendant's past drug use with Bernadette. Testimony by Mary Hanna-Rezmierski, one of the prosecutors, at the evidentiary hearing, as well as statements by the trial court, confirm that defense counsel had a valid strategic reason for not calling Bernadette as a witness. Hanna-Rezmierski testified that she wanted Bernadette to testify because there were fertile areas for her to explore on cross-examination, including defendant's mental health and addiction issues. The trial court, upon watching Bernadette at the evidentiary hearing, stated that Hanna-Rezmierski would have taken Bernadette apart on cross-examination.

Admittedly, defense counsel made the decision not to call Bernadette as a witness before trial commenced. Even after the prosecution's change in theory regarding motive, defense counsel's strategic reasons for not calling Bernadette as a witness remained valid. Although Bernadette could have offered testimony that rebutted the prosecution's theory that defendant engaged in larcenous conduct on September 8, 2012, there remained the dangers that the jury would not view Bernadette as a credible witness and that the prosecution, through its cross-examination of Bernadette, would elicit testimony that would undermine the insanity defense. Where the only defense asserted to the charged crimes was that defendant was legally insane and where there was a danger that Bernadette, if she testified, would give testimony that undermined the defense, defendant has failed to overcome the strong presumption that defense counsel's performance in not calling Bernadette as a witness was sound trial strategy. *Toma*, 462 Mich at 302. Accordingly, defendant has failed to show that defense counsel's performance fell below objective standards of reasonableness. *Armstrong*, 490 Mich at 289.

Defendant also claims that defense counsel was ineffective for failing to object to the prosecution's remark during rebuttal closing argument that it could not have charged defendant with armed robbery because the "charging ship [had] already sailed" when it received Wendt's report. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Because defendant has not cited any authority in support of the argument that the prosecution made a legally incorrect statement, defendant has abandoned the claim of ineffective assistance of counsel, and we decline to address it.

## II. JURY SELECTION

Defendant argues that the trial court erred when it denied his *Batson*[1] challenges to two African-American jurors, Juror L. and Juror C. Plaintiff claims that defendant waived the issue because the *Batson* challenges were not made until after the jury was sworn. A *Batson* challenge is timely if it is made before the jury is sworn. *People v Knight*, 473 Mich 324, 348; 701 NW2d 715 (2005). The failure to make a timely *Batson* challenge results in a waiver of the claim. *Id.* at 346 n 14.

---

[1] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

Regarding Juror L., when the prosecution sought to use a peremptory challenge against him, defendant objected and the trial court heard defendant's *Batson* challenge. However, because neither party had asked Juror L. any questions, the trial court did not decide the *Batson* challenge. It told the parties that it was going to allow more questioning of Juror L. before it made a decision. But, after Juror L. was questioned and the prosecution renewed the peremptory challenge against Juror L., defendant made no further objection regarding Juror L. until after the jury was sworn. Because defendant did not make an objection to the prosecution's renewed request to use a peremptory challenge against Juror L. until after the jury was sworn, the objection was not timely. *Id.* at 348. Therefore, the issue with regard to Juror L. is waived, *id.* at 346 n 14, and the waiver extinguished any error, *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

Regarding Juror C., at defendant's request, after the prosecution stated that it was using a peremptory challenge against him, a bench conference was held. The bench conference was not transcribed. Nonetheless, it is clear from the trial court's statement that was made after the jury was sworn and in response to defendant's arguments regarding the excusal of Juror L. and Juror C. that defendant raised a *Batson* challenge at the bench conference, that the trial court preliminarily dealt with it, and that the trial court was allowing defendant to supplement the record. Thus, while the *Batson* challenge regarding the prosecution's use of a peremptory challenge against Juror C. was not put on the record before the jury was sworn, it was made before the jury was sworn and, therefore, it was timely. *Knight*, 473 Mich at 348.

Regardless whether the *Batson* challenges were timely, we find no merit to defendant's claim that the trial court erred in rejecting the challenges. Our review is governed by which step of *Batson*'s three steps is before the Court:

> If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error. [*Id.* at 345.]

Defendant's arguments on appeal implicate the second and third steps.

The second step of *Batson* requires the prosecution to articulate a race-neutral explanation for the peremptory challenge. *Id.* at 337. A race-neutral explanation is one that is based on something other than the juror's race. *Id.* The prosecution told the trial court that it excused Juror L. because numerous facts about him—his age, his failure to complete the juror questionnaire, his unemployment, and his somewhat transient living—gave it some concern. The prosecution then explained that, although Juror C. had a brother who had schizophrenia, the primary reason that Juror C. was excused was because of Juror C.'s behavior and attitude, which left the prosecution with a "gut discomfort." The prosecution's reasons for excusing Juror L. and Juror C. were race neutral; they were based on something other than race. *Id.* We reject

defendant's argument that, because the prosecution must provide more than a statement of subjective, intangible discomfort with a venire member, the prosecution failed to offer a race-neutral reason for excusing Juror C. The prosecution's "gut discomfort" with Juror C. was based on Juror C.'s attitude and interaction with the prosecution during voir dire. The body language and demeanor of a venire member is a permissible race-neutral justification. *United States v Forrest*, 402 F3d 678, 687 (CA 6, 2005).

The third step of the *Batson* analysis requires the trial court to determine whether the race-neutral explanation is pretext and whether the opponent of the peremptory challenge has proved purposeful discrimination. *Knight*, 473 Mich at 337-338. The trial court is required to assess the plausibility of the race-neutral explanation in light of all the evidence with a bearing on it. *Miller-El v Dretke*, 545 US 231, 251-252; 125 S Ct 2317; 162 L Ed 2d 196 (2005). A trial court's findings on purposeful discrimination are to be given great deference:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." [*Hernandez v New York*, 500 US 352, 365; 111 S Ct 1859; 114 L Ed 2d 395 (1991).]

Defendant argues that the prosecution made an incorrect legal statement when, in response to his *Batson* challenges, it argued that the challenges failed on their face because two African-Americans were selected as jurors. This was an incorrect statement of the law. The failure to exclude one member of a protected class from the jury is insufficient to insulate the unlawful exclusion of other members. *Lancaster v Adams*, 324 F3d 423, 434 (CA 6, 2003); *United States v Battle*, 836 F2d 1084, 1086 (CA 8, 1987). However, we disagree with defendant that, because of the conclusory nature of the trial court's statement when it denied the *Batson* challenges, it cannot be determined whether the trial court relied on the prosecution's incorrect legal statement. In denying the *Batson* challenges, the trial court stated that it was satisfied that the "reasons offered" for the peremptory challenges were "being offered on a race neutral basis." Thus, the trial court's statement, despite its shortness, shows that the trial court denied the *Batson* challenges because the prosecution offered race-neutral reasons for the peremptory challenges. Nothing that the trial court said indicates that it denied the *Batson* challenges because two African-Americans were selected as jurors.

Regarding Juror L., defendant argues that the trial court erred in accepting the prosecution's race-neutral reason because the information that Juror L. provided about himself during voir dire did not disqualify him to be a juror or show any bias. The prosecution stated that numerous facts about Juror L., including his age, his failure to complete the juror questionnaire, and his lack of employment, gave the prosecution concern about him. Regarding Juror C., defendant argues that any reliance by the prosecution on the fact that Juror C. had a brother who suffered from schizophrenia was a pretext for discrimination because the

prosecution did not use peremptory challenges against other venire members who suffered from mental health issues or who had family members who did. However, the prosecution did not use a peremptory challenge against Juror C. because of his brother. Although the prosecution acknowledged that Juror C. had a brother who suffered from schizophrenia, it stated that the primary reason Juror C. was excused was because it was left with "a gut discomfort" of Juror C. based on his attitude and demeanor. The best evidence whether to believe the prosecution was the prosecutor's demeanor, an evaluation of which was peculiarly within the trial court's province. *Hernandez*, 500 Mich at 365. Defendant has not cited to anything in the record that would indicate that the prosecution's race-neutral reasons were a pretext for discrimination. Accordingly, the trial court did not clearly err in finding that the prosecution's race-neutral reasons were not a pretext for discrimination. *Knight*, 473 Mich at 345. The trial court did not err in denying defendant's *Batson* challenges.

## III. EXPERT TESTIMONY

Defendant argues that the trial court erred when it determined that Rosemary Heise, the clinical director of the Recovery Court of the Jackson Circuit Court, was qualified to give an expert opinion regarding whether defendant was an addict. Defendant also argues that the trial court erred because it did not limit Heise's testimony to common characteristics of drug addicts. We need not determine, however, whether the trial court erred in either instance. Rather, we are convinced that, even assuming error in either case, any error was harmless beyond a reasonable doubt.

The erroneous admission of evidence is a nonconstitutional error. *People v Whittaker*, 465 Mich 422, 426; 635 NW2d 687 (2001), reh den 465 Mich 1307 (2002). "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999) (quotation omitted). This inquiry focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence. *Id.* at 496.

As detailed in Issue I, *supra*, the prosecution in its closing argument argued that, on September 8, 2012, defendant was a drug addict who was out of money and that money was defendant's motive for shooting Robert. Heise's expert testimony that defendant was an addict supported the prosecution's new theory regarding motive. However, even absent expert testimony from Heise that defendant was an addict, the prosecution could have argued that defendant was addicted to Adderall.

Dr. Glen Toplyn, an expert in forensic psychiatry from the Center for Forensic Psychiatry, testified that, although he found no evidence to conclude that defendant was abusing Adderall, there was information to question whether defendant was, in fact, abusing. Dr. Patrick Gibbons, an expert in addiction psychiatry, testified that there were a lot of "red flags" regarding defendant's use of Adderall. Those "red flags" included that in December 2011 defendant described symptoms, i.e., narcolepsy, to his treating psychiatrist, Dr. Jajo, for which Adderall is prescribed, that in April 2012 defendant said that he had lost his prescription, and that in July 2012 defendant said on two occasions that his prescription was either lost or stolen. Additionally, on August 29, 2012, defendant filled a prescription for Adderall; 60 pills had been

dispensed to defendant. The pill bottle was found empty 10 days later on September 8, 2012. Dr. Jeffrey Wendt, who testified as a psychiatric expert, admitted that the empty bill bottle could raise a concern that defendant was abusing Adderall. In rebuttal closing argument, the prosecution made a lengthy argument, based on Jajo's records, that defendant was not in compliance with the prescribed Adderall use. The prosecution referenced the above facts, and also the facts that on April 26, 2012, July 26, 2012, and August 2, 2012, defendant visited Jajo even though his current prescription had not run out and that on two of these visits, the April 26 and August 2 visits, defendant obtained a new prescription for Adderall. Because the prosecution could argue from Jajo's records that defendant was addicted to Adderall and defendant's own experts admitted that some of defendant's conduct was concerning or raised red flags, it does not affirmatively appear from an examination of the entire cause that it is more probable than not that any error by the trial court in concluding that Heise was qualified to give an opinion regarding whether defendant was an addict, or any testimony outside that expertise, was outcome determinative. *Lukity*, 460 Mich at 495-496.

In sum, Heise's testimony was largely cumulative to that given by the various expert witnesses from both sides in this case. Moreover, any argument made by the prosecution in closing could still have been made without Heise's testimony, based upon the testimony of the those other experts. Accordingly, we find any error regarding Heise's testimony to be harmless.

Affirmed.

/s/ David H. Sawyer
/s/ Michael J. Kelly